# Exhibit 1



IN THE SUPERIOR COURT
OF THE VIRGIN ISLANDS

**FILED**

August 07, 2022 10:12 AM
SX-2022-CV-00388
**TAMARA CHARLES**
**CLERK OF THE COURT**

**IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| Paul J. Arnold, Sr. | SX-2022-CV-_____ |
| *Plaintiff,* | **Complex Litigation Division** |
| v. | **ACTION FOR DAMAGES** |
| Lockheed Martin Corp., Glencore Ltd., *and* John Doe, Inc. | **Jury Trial Demanded** |
| *Defendants,* | |

## COMPLAINT

Plaintiff Paul J. Arnold, Sr. brings this action for damages under the laws of the United States Virgin Islands, demands a trial by jury, and makes the following allegations based on information, belief, and investigation of counsel, except those allegations that pertain to Plaintiff, which are based on personal knowledge:

### PARTIES, JURISDICTION, AND VENUE

1.       Plaintiff is a citizen and resident of St. Croix, United States Virgin Islands.

2.       Defendant Lockheed Martin Corp. is a Maryland corporation, having its principal place of business in Maryland. It is subject to the specific personal jurisdiction of this Court. It is the successor-in-interest to Martin Marietta Corp., Martin Marietta Aluminum Properties Corp., Martin Marietta Aluminum Corp., Martin Marietta Alumina Corp., Harvey Aluminum, Inc., and Harvey Alumina, Inc.

3.       Defendant Glencore Ltd. is a Swiss foreign business corporation, having its principal place of business in New York.

4.       John Doe, Inc., is currently in an alleged involuntary Chapter 7 bankruptcy, under information and belief, to be spurious and specious.  Defendant John Doe will be added as a Defendant when this bankruptcy is dismissed or when any automatic stay is lifted, as the Plaintiff

intends to proceed against John Doe's legacy third-party general liability insurance policies – which are not considered an asset of the estate in bankruptcy.

5. John Doe is Cosmogony II, Inc. ("Cosmogony") the successor-in-interest to General Engineering Corporation. Cosmogony is a U.S. Virgin Islands company, , having its principle place of business in the U.S. Virgin Islands. General Engineering Corporation merged with and into U&W Industrial Supply, Inc. ("U&W"), a U.S. Virgin Islands corporation. U&W later changed its name to Cosmogony. General Engineering Corporation and Cosmogony are hereinafter referred to collectively as "GEC".

6. This Court has subject matter jurisdiction pursuant to 4 V.I.C. § 76.

7. Venue is this District is proper pursuant to 4 V.I.C. § 78 because the conduct complained of in this Complaint was carried out in substantial part within this judicial division.

## FACTUAL ALLEGATIONS RE: THE PLAINTIFF

8. Plaintiff worked at the Alumina Refinery from 1973 to 1985 and 1992 to 1997.

9. During his work at the Alumina Refinery, Plaintiff worked as a human resource manager.

10. In the course of his employment at the Alumina Refinery, Plaintiff was exposed to bauxite ore dusts (and their consituents and waste products), caustic soda, asbestos-containing materials ("ACM"), and alumina dust.

11. Plaintiff used no or substandard respiratory protection during his employment at the Alumina Refinery. This protection was wholly inadequate to guard against the inhalation of toxic substances like bauxite, alumina, silica, caustic, and asbestos.

12. Plaintiff suffers from pneumoconiosis, which became evident 8/8/2020.

13. This disease is evidenced by a chest x-ray (read by a competent NIOSH-certified B-reader) a pulmonary function test (PFT), a physical examination, and a discussion and consideration of Plaintiff's work history, among other things.

14.     Plaintiff's lung disease is characterized by shortness of breath, diminished lung capacity, and other respiratory ailments.

15.     This disease and injury are the direct and proximate result of Plaintiff's repeated unprotected exposure to various toxic substances during his work at the Alumina Refinery.

16.     Plaintiff's injuries are current and will continue for the rest of his life. He seeks recompense for his pain and suffering; his medical bills and anticipated medical needs in the future; and the diminution in quality and enjoyment of his life.

17.     Plaintiff fears the progression of his respiratory symptoms and reasonably fears that he may develop cancer as a result of persistent exposure to toxic materials and substances.

18.     Plaintiff is also at a medically and statistically significant increased risk of developing lung cancer, mesothelioma, and other cancers.

19.     Plaintiff also seeks punitive damages, as Defendants' actions and inactions, separately considered, were outrageous because of a reckless indifference to Plaintiff's rights.

### FACTUAL ALLEGATIONS VIS-À-VIS INDUSTRIAL EXPOSURES

20.     The U.S. Federal Government has long regulated the limits of industrial exposure to minerals, metals, chemicals, and other agents in the workplace. And the U.S. Virgin Islands has long regulated emissions of fugitive particulate matter.

21.     Industry must take all reasonable steps to guard against the release of toxic dusts through sound engineering practices, procedures, and controls. They must conduct air and worker monitoring to assess the concentration of particulate matter.

22.     Because engineering practices, procedures, and controls may not eliminate and/or reduce all dust generation, persons in industrial settings that could be exposed to excessive dust levels must be given proper, appropriate, and timely warnings, training, and personal protective equipment, including respiratory protection.

23.

**FACTUAL ALLEGATIONS VIS-À-VIS THE ALUMINA REFINERY**

24.     An Alumina Refinery operated on St. Croix from the early- to mid-1960s to 2000. The Alumina Refinery refined bauxite ore into alumina (aluminum oxide).

25.     Harvey Aluminum, Inc. built the Alumina Refinery. It leased the Alumina Refinery to its wholly-owned subsidiary, Harvey Alumina, Inc., which ran the refining operations and handled everything except for maintenance activities. Harvey Aluminum owned the appurtenances and equipment at the Alumina Refinery, which appurtenances and equipment were leased to Harvey Alumina. Harvey Aluminum also entered long-term contracts with mining companies for the purchase of bauxite ore to the Alumina Refinery. It shipped or arranged the shipment of purchased bauxite ore to the Alumina Refinery for refinement. Harvey Aluminum changed its name to Martin Marietta Aluminum, Inc. in approximately 1972.

26.     Martin Marietta Aluminum, Inc. ("M/M Aluminum") succeeded to Harvey Aluminum's rights and obligations under the bauxite ore supply agreement(s). Harvey Alumina assigned its leasehold to Martin Marietta Alumina, Inc. ("M/M Alumina"), which assumed the obligations of the lease. As under previous management, M/M Alumina ran the bauxite refining operations, except for maintenance activities which M/M Aluminum handled. Also as under previous ownership, M/M Aluminum purchased bauxite ore, which it delivered to the Alumina Refinery for refining.

27.     M/M Aluminum sold the Alumina Refinery to Martin Marietta Aluminum Properties, Inc. ("MMAP") in 1985. In turn, MMAP sold the Alumina Refinery to Virgin Islands Alumina Company ("VIALCO") in 1989.

28.     VIALCO was the wholly-owned subsidiary of Glencore Ltd. at all times relevant to this action. It operated the Alumina Refinery from 1990 to 1995. Prior to operating the Alumina Refinery, VIALCO had not owned or operated any other alumina refinery. From 1990 to 1995, Glencore supplied VIALCO and the Alumina Refinery with bauxite ore.

29.     During the years that the Martin Marietta family of companies and VIALCO owned and/or operated the Alumina Refinery, GEC was contracted to provide construction and maintenance services.

30.     Bauxite is a naturally occurring material comprised of hydrated aluminum oxides and aluminosilicates, iron oxides, titanium dioxide, silica, beryllium, and mixtures of other materials; including, quartz, clay minerals, gibbsite [Al(OH)], boehmite [ALO(OH)], and diaspore [ALO(OH)]. Bauxite is the principle ore of alumina (AL2O3).

31.     During the refining process, bauxite ore is, among other activities, crushed and ground, which continuously creates large amounts of dust. In his work at the Alumina Refinery, Plaintiff was in constant contact with, and exposed to, this unrefined bauxite dust and its constituents.

32.     Caustic soda is added to the ground ore, some of which becomes airborne. In his work at the Alumina Refinery, Plaintiff was in frequent proximity to and inhaled caustic soda dust.

33.     The refinement process involves many hot processes that require the maintenance of high temperatures. To that end, the Alumina Refinery used ACM to insulate vessels, machinery, and pipe. In his work at the Alumina Refinery, Plaintiff was in frequent proximity to and inhaled ACM.

34.     The finished alumina product is a white/silver powder. The alumina is highly susceptible to becoming airborne because of the prevailing trade winds. In his work at the Alumina Refinery, Plaintiff was in frequent proximity to and inhaled alumina dust.

35.     The refinement process also generates a great deal of toxic industrial waste sometimes called "red mud". The chemical composition may include iron (III) oxide (Fe2O3), aluminum oxide (Al2O3), silicon dioxide (SiO2), copper (II) oxide (CuO), sodium oxide (Na2O), titanium dioxide (TiO2), potassium oxide (K2O), selenium trioxide (Se2O3), and vanadium pentoxide (V2O5), arsenic (As), lead (Pb), mercury (Hg), nickel (Ni), chromium (Cr), cadmium (Cd), as well as radioactive uranium and thorium. When red mud dries, it becomes chalky and airborne. In his work at the Alumina Refinery, Plaintiff was in frequent proximity to and inhaled red mud dust.

36.     Alumina refiners have long understood the dangers posed by exposure to bauxite ore dust, its constituent components and waste products (including red mud), caustic soda, ACM, and refined alumina. Research shows that exposure to these elements (or mixtures thereof) in industrial settings can cause serious medical problems, including decreased FEV1, radiographic abnormalities, increased opacities, upper and lower respiratory symptoms (shortness of breath, wheeze, chest tightness, rhinitis), pulmonary fibrosis, mixed dust pneumoconiosis, interstitial fibrosis, fibrotic lesions, parenchymal changes, lung cancer, and aluminosis.

## CAUSE OF ACTION AGAINST LOCKHEED MARTIN AS SUCCESSOR-IN-INTEREST TO MARTIN MARIETTA CORP.

### Count 1 – Negligent Undertaking

37.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin Corp. is liable to Plaintiff under Section 324A of the Restatement (Second) of Torts, which articulates a sound rule for the Virgin Islands, as the successor-in-interest to Martin Marietta Corp. ("M/M Corp.").

38.     The Alumina Refinery's safety department was chronically understaffed. It never had an industrial hygienist on staff, which was crucial to ensure compliance with government regulations and good safety practices, particularly in such a hazardous environment.

39.     In any event, the safety staff at the Alumina Refinery lacked the requisite, education, knowledge, and experience to anticipate, recognize, evaluate, and control the hazards posed by fugitive dusts, including bauxite dust – the key fugitive by-product of the refinement of bauxite ore.

40.     Consequently, the Alumina Refinery's utility was limited. It had the ability to address patent safety deficiencies and acute health issues, such as lacerations and burns. However, the staff lacked the ability to guard against and detect latent health issues, such as lung diseases caused by the chronic inhalation of fugitive dusts.

41.     As a result, the Alumina Refinery counted on M/M Corp. – its parent company – to fill these deficiencies.

42.     M/M Corp. issued its own safety policies, which were much more robust than any policies that were issued and in-effect locally. That's because M/M Corp. had the appropriate staff, with the appropriate expertise, to develop a sufficient safety policy. M/M Corp.'s safety policies, by their own terms, applied to the Alumina Refinery.

43.     M/M Corp. had a robust respiratory policy, but it did not make this policy or any of the accompanying educational materials available to the managers on St. Croix. Ultimately, M/M Corp.'s respiratory policies were not followed at the Alumina Refinery.

44.     But this failure went a step further. M/M Corp. misled the staff on St. Croix to believe that bauxite was non-toxic. Workers at the Alumina Refinery relied on M/M Corp. to provide hazards information. But the local staff was of the mistaken belief that bauxite was merely a nuisance dust because they lacked the technical expertise to understand that the term "nuisance" did not mean that the dust was inert if inhaled. The local staff relied on M/M Corp. to provide them with MSDS sheets because they were not available locally on St. Croix. However, even when these sheets were made available, they were ignored because, as M/M Corp. told the Alumina Refinery that bauxite ore was safe to breathe in and would not cause damage to the lungs.

45.     Moreover, M/M Corp. directed company presidents, including the presidents M/M Aluminum and M/M Alumina to initiate and conduct formal occupational safety health programs. However, that directive was ignored in St. Croix – whether for budgetary reasons or otherwise – as a formal occupational safety health program was never developed at the Alumina Refinery.

46.     In accordance with M/M Corp.'s policy, M/M Corp. was to receive job safety analyses from M/M Alumina. However, those analyses were never sent to M/M Corp., nor did M/M Corp. follow up with M/M Alumina on why the analyses were not being submitted.

47.     Job safety analyses are critical to establishing a safe sequence of basic job tasks; identifying potential hazards and developing solutions that will eliminate or control personal exposures; as well as critical to training employees on the safety handling of toxic materials, including bauxite ore and its dusts.

48.     M/M Corp. conducted bi-annual plant audits and inspections The audits extended to verifying compliance with M/M Corp. respiratory policy, the vitality of its occupational safety health programs, whether it was conducting job safety analyses, etc. M/M Alumina relied upon M/M Corp.'s audits because it was unable to adequately screen for potential problems with its own resources.

49.     However, M/M Corp. failed to fulfill this audit function, as it failed to recognize that the Alumina Refinery was not assessing the possible damage that airborne bauxite dust and other fugitive dusts were causing to the workforce, but even worse, failing to ensure that the Alumina Refinery corrected these glaring deficiencies. As a result, M/M Corp. couldn't effectively perform its audit role.

50.     These failures to appropriately audit the operations of the Alumina Refinery were fundamental in light of how the Martin Marietta family of companies were structured. M/M Corp.'s subsidiaries had only the basic knowledge and staffing necessary to complete their immediate tasks. Anything beyond that immediate task was need-to-know, which required the input and assistance of corporate. If corporate did not provide the resources or double-check that the subsidiaries were following corporate policies, then the policies were not followed.

51.     These failures manifest in two M/M Corp. surveys of the Alumina Refinery in 1976 and in 1981.

52.     M/M Corp. performed a survey of the St. Croix plant in 1976. The survey revealed airborne silica in excess of safe levels. It concluded that there was a need for ongoing additional air sampling to ensure compliance with safety standards, the need for greater dust control, and the need for surveillance of workers. Despite these obvious warning signs, M/M Corp. neither shut down the

Alumina Refinery, nor demanded immediate upgrades, nor ensured that the local staff was immediately educated on how to better protect its workforce.

53.     M/M Corp. later conducted its one and only industrial hygiene survey in 1981 by the corporate family's lone industrial hygienist. The survey recommended a robust sampling program to assess the level of suspended dust particles; that the St. Croix plant conduct pulmonary function testing and respirator fit tests; and that St. Croix develop its own sampling capacity. M/M Corp. knew that these critical safety policies should have been in place for years, and yet still it failed to adequately follow up on and ensure that the Alumina Refinery implemented these recommendations. The Alumina Refinery eventually purchased some air sampling equipment, but that equipment largely went unused.

54.     M/M Corp. undertook to render services to its three subsidiaries at the Alumina Refinery—M/M Aluminum, M/M Alumina, and MMAP (collectively, "M/M Subsidiaries"). It should have recognized the services it provided to its M/M Subsidiaries and/or the Alumina Refinery were necessary for the protection of Plaintiff, generally or in particular.

55.     M/M Corp. failed to exercise reasonable care. This failure to exercise reasonable care increased the risk of harm to Plaintiff. M/M Corp. undertook to perform a duty owed by one or more M/M Subsidiaries to Plaintiff. The M/M Subsidiaries and/or Plaintiff relied on M/M Corp. to fulfill its undertaking.

56.     Plaintiff was injured as a result of M/M Corp.'s failure to fulfill its undertaking. Consequently, M/M Corp. directly and proximately caused, and is legally responsible and liable for, the harm and damages Plaintiff sustained as a result of his exposure to bauxite ore dusts (and its constituents and waste products), alumina dusts, caustic, and asbestos.

CAUSES OF ACTION AGAINST LOCKHEED MARTIN,
AS SUCCESSOR-IN-INTEREST TO MARTIN MARIETTA ALUMINUM INC.

**Count 2 – Premises Liability**

57.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin Corp. is liable to Plaintiff as a premise in accordance with the rule articulated in *Machado v. Yacht Haven, U.S.V.I., LLC*, 61 V.I. 373 (2014), as the successor-in-interest to Martin Marietta Aluminum, Inc.

58.    M/M Aluminum was a legal possessor of the Alumina Refinery from 1968 to 1985, and it was a possessor during Plaintiff's working years at the Alumina Refinery.

59.    M/M Aluminum had knowledge of the harmful nature of, and danger posed by, bauxite and alumina dusts (and their constituents) at all times while Plaintiff was on the Alumina Refinery premises. It had a duty to exercise reasonable care including providing Plaintiff with a safe work environment and warning Plaintiff of any dangers that it could not make safe.

60.    M/M Aluminum knew or should have known that these exposures posed a foreseeable and unreasonable risk of harm to Plaintiff and others. This foreseeable harm could have been prevented if M/M Aluminum had implemented and enforced proper safety measures at the Alumina Refinery, and had also warned Plaintiff of the dangers.

61.    M/M Aluminum knew or should have known that Plaintiff would not discover or realize the danger, as it was in a superior position of power and knowledge.

62.    M/M Aluminum breached its duty by failing to use reasonable care to protect Plaintiff, by failing to warn Plaintiff of the dangers, and by failing to provide a safe work environment.

63. Martin Marietta Aluminum, Inc.'s actions and failures to act include:

a.    Failing to adequately monitor the concentration of bauxite and alumina dusts, their hazardous constituents, and waste products in the Alumina Refinery;

b.      Failing to take appropriate safety precautions regarding to toxic, carcinogenic, hazardous, and/or irritating dusts, fumes, and other substances;

c.      Failing to provide and require the wearing of protective clothing; to provide effective masks, respirators, and/or fresh air sources; to provide adequate changing rooms, showers, laundry, and other safety services for exposed workers;

d.      Failing to post warning signs;

e.      Failing to warn Plaintiff of the health risks associated with bauxite and alumina dust exposures, as well as exposure to as bauxite's hazardous constituents and waste products;

f.      Failing to timely and appropriately train Plaintiff and his co-workers; and

g.      Failing to timely and appropriately engage in medical surveillance of exposed persons, including Plaintiff; to timely and appropriately monitor workforce exposure and health, as well as that of their families, including that of Plaintiff.

64.     The failures of M/M Aluminum were also in violation of the law. At all relevant times, the V.I. government proscribed causing or permitting materials to be handled, used, constructed, altered, repaired, or demolished without taking appropriate precautions to prevent particulate matter from becoming airborne. In particular, the following precautions are required, among others:

a.      The use, where possible, of water or suitable chemicals for the control of dusts in quarrying operations;

b.      The application of asphalt, water, or suitable chemicals on dirt roads, materials, stockpiles, and other surfaces that can give rise to airborne dust; and

c.      The installation and use of hoods, fans, and fabric filters to enclose and vent the handling of dusty materials.

65.     M/M Aluminum's failures to abide by Virgin Islands law constitutes negligence *per se*. Workers at the Alumina Refinery, like Plaintiff, fall within the ambit of these legal protections, as it is precisely those who are injured as a result of operations on the premise who would be most likely to

be affected by the failure to abide.

66.     Further, M/M Aluminum leased the Alumina Refinery to M/M Alumina. When it executed the lease, the Alumina Refinery was in a condition of disrepair. The Alumina Refinery was in disrepair because it was outfitted with old and/or inadequate machinery, dust control devices, and tools that did not comport with developments in technology and industry.

67.     In the lease agreement, M/M Aluminum agreed to keep the Alumina Refinery in repair. The disrepair of the Alumina Refinery created an unreasonable risk to workers, which the performance of M/M Aluminum's agreement would have prevented. M/M Aluminum failed to exercise reasonable care in performing its obligation to keep the Alumina Refinery in a state of repair.

68.     The Alumina Refinery is dirty by design. Extracting alumina (aluminum oxide) from raw bauxite ore generates a large and continuous amounts of respirable dust from moving it with heavy machinery, shoveling it, crushing it, etc. Mud tailings are dried in ponds, and during the dry season, this mud becomes dirt, and once again the workforce is exposed to respirable bauxite dusts and alumina dusts, including their constituents and waste products.

69.     M/M Aluminum knew, or by the exercise of reasonable care could have discovered, that this condition of the Alumina Refinery involved an unreasonable risk of harm to the workforce on the premises and members of their families. It had reason to suspect that M/M Alumina would not correct the condition before admitting the workforce to the Alumina Refinery. And it failed to exercise reasonable care to discover or to remedy the condition or otherwise to protect the workforce and their families against the condition.

70.     M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dust (and its constituents), caustic fume, asbestos, and alumina, as well as the harm and damages Plaintiff has sustained as a result of this exposure.

## Count 3 – Chattel Known to be Dangerous for Intended Use

71.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin is liable to Plaintiff under Section 388 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands, as the successor-in-interest to M/M Aluminum.

### Count 3(a) – Bauxite as Chattel

72.     Prior to 1986, M/M Aluminum supplied bauxite ore—a chattel—to the Alumina Refinery for use.

73.     M/M Aluminum should have expected the Alumina Refinery and Plaintiff to use the bauxite ore, as well as expect that Plaintiff could be endangered by the probable uses of bauxite ore—namely, refinement. It knew or had reason to know that bauxite ore is dangerous or likely to be dangerous during the refinement process. It had no reason to believe that the Alumina Refinery or Plaintiff would realize the dangerous condition of bauxite ore.

74.     M/M Aluminum failed to exercise reasonable care to inform either the Alumina Refinery or Plaintiff of the dangerousness of bauxite ore or the facts which make bauxite ore likely to be dangerous.

75.     Plaintiff was harmed as a result of M/M Aluminum's failures. M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff has sustained as a result of that exposure.

### Count 3(b) – Refinery Machinery & Equipment as Chattel

76.     Prior to 1986, M/M Aluminum leased refining machinery, appurtenances, and equipment—chattels—to M/M Alumina for use at the Alumina Refinery.

77.     The Alumina Refinery is outfitted with machinery and equipment designed to move and pulverize bauxite ore. This machinery and equipment includes conveyor belts, chutes, ball grinders, digestors, etc. During refinement operations, these machines and equipment create and

spread large amounts of bauxite ore dusts and its constituents. Consequently, the workforce at the Alumina Refinery is invariably exposed to and inhales bauxite ore dusts and its constituents.

78.     M/M Aluminum should have expected the Alumina Refinery and Plaintiff to use the refinery machinery and equipment, as well as expect that Plaintiff could be endangered by the probable uses that machinery and equipment—namely, moving and pulverizing bauxite ore. Plaintiff was harmed by the bauxite ore supplied by M/M Aluminum to the Alumina Refinery.

79.     M/M Aluminum knew or had reason to know that refinement machinery and equipment was dangerous or likely to be dangerous during the refinement process. It had no reason to believe that M/M Alumina or Plaintiff would realize the dangerous condition of the refinement machinery and equipment. And it failed to exercise reasonable care to inform either M/M Alumina or Plaintiff of the dangerousness of refinement machinery and equipment or the facts which make refinement machinery and equipment likely to be dangerous.

80.     Consequently, M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff has sustained as a result of this exposure.

### Count 3(c) – Heavy Equipment as Chattel

81.     Prior to 1986, M/M Aluminum leased heavy machinery—chattels—to M/M Alumina for use at the Alumina Refinery. Workers at the Alumina Refinery used bulldozers, backhoes, cranes, dump trucks, and other large machinery to unload bauxite ore from vessels, position the raw bauxite ore in the storage shed, load raw bauxite ore onto conveyers, and to cleanup excess materials.

82.     The use of heavy equipment at the Alumina Refinery created and spread large amounts of bauxite dusts and its constituents. Consequently, the workforce at the Alumina Refinery is invariably exposed to and inhales bauxite ore dusts and its constituents.

83.     Plaintiff was harmed by the heavy equipment supplied by M/M Aluminum to the Alumina Refinery because he frequently inhaled bauxite ore dust kicked-up by the heavy machinery.

84.     M/M Aluminum should have expected the Alumina Refinery and Plaintiff to use the heavy equipment, as well as expect that Plaintiff could be endangered by the probable uses that heavy equipment —namely, moving bauxite ore. It knew or had reason to know that heavy equipment was dangerous or likely to be dangerous during the refinement process. It had no reason to believe that the M/M Alumina, or Plaintiff would realize the dangerous condition of the heavy equipment. And it failed to exercise reasonable care to inform M/M Alumina, or Plaintiff of the dangerousness of heavy equipment or the facts which made heavy equipment likely to be dangerous.

85.     Consequently, M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff has sustained as a result of this exposure.

## Count 4 – Chattel Unlikely to be Made Safe for Use

86.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin is liable to Plaintiff under Section 389 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands, as the successor-in-interest to M/M Aluminum.

### Count 4(a) – Bauxite as Chattel

87.     M/M Aluminum supplied bauxite ore—a chattel—to the Alumina Refinery for use.

88.     While M/M Aluminum provided warnings and/or MSDS sheets to the operator(s) of Alumina Refinery, those warnings and MSDS sheets went unheeded. M/M Aluminum knew or should have known that its warnings and/or MSDS sheets were not being communicated to the workforce at the Alumina Refinery. M/M Aluminum knew or should have known that the bauxite ore was unlikely to be made reasonably safe before being put to the use in the manner expected—namely, refinement into alumina.

89.     Plaintiff was a foreseeable user of the chattel, and it was foreseeable that Plaintiff would be injured by the probable use of the chattel. Plaintiff was ignorant as to the dangerous character

of bauxite ore and was not contributorily negligent.

90.     M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff sustained as a result of this exposure.

### Count 4(b) – Refinery Appurtenances as Chattel

91.     M/M Aluminum leased refining machinery, appurtenances, and equipment— chattels—to M/M Alumina for use at the Alumina Refinery. The Alumina Refinery is outfitted with machinery and equipment designed to move and pulverize bauxite ore. This machinery and equipment includes conveyor belts, chutes, ball grinders, digestors, etc.

92.     M/M Aluminum knew or should have known that the machines and equipment were unlikely to be made reasonably safe before being put to the use in the manner expected—namely, used in the processing of bauxite ore into alumina (aluminum oxide).

93.     During refinement operations, these machines and equipment create and spread large amounts of bauxite ore dusts and its constituents. Consequently, the workforce at the Alumina Refinery was invariably exposed to and inhales bauxite ore dusts and its constituents.

94.     Plaintiff was a foreseeable user of the chattels, as well as endangered by the probable use of the chattels. He was ignorant as to the dangerous character of the machines and equipment was not contributorily negligent.

95.     M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents as a result of the dangerous machines and equipment, as well as the harm and damages Plaintiff sustained as a result of this exposure.

### Count 5 – Chattel for Use by Person Known to be Incompetent

96.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin is liable to Plaintiff under Section 390 of the Restatement

(Second) of Torts, which articulates a sound common law rule for the Virgin Islands, as the successor-in-interest to M/M Aluminum.

### Count 5(a) – Bauxite as Chattel

97.    At all relevant times, M/M Aluminum supplied bauxite ore—a chattel—to the Alumina Refinery for use.

98.    M/M Aluminum knew or had reason to know that the operators of the Alumina Refinery were using supplied bauxite ore in a manner that involved an unreasonable risk of physical harm to Plaintiff. In particular, M/M Aluminum knew or had reason to know that the Alumina Refinery owners and operators were incompetent, as they lacked an adequate respiratory policy and failed to abide applicable government regulations.

99.    M/M Aluminum should have expected that Plaintiff would be endangered by the use of bauxite ore at the Alumina Refinery.

100.    M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents , as well as the harm and damages Plaintiff sustained as a result of this exposure.

### Count 5(b) – Refinery Appurtenances as Chattel

101.    At all relevant times, M/M Aluminum leased refining machinery, appurtenances, and equipment—chattels—to M/M Alumina for use at the Alumina Refinery.

102.    The Alumina Refinery is outfitted with machinery and equipment designed to move and pulverize bauxite ore. This machinery and equipment includes conveyor belts, chutes, ball grinders, digestors, etc. During refinement operations, these machines and equipment create and spread large amounts of bauxite ore dusts and its constituents. Consequently, the workforce at the Alumina Refinery is invariably exposed to and inhales bauxite ore dusts and its constituents.

103.    M/M Aluminum knew or had reason to know that the operators of the Alumina Refinery were using supplied refinement machinery and equipment in a manner that involved an

unreasonable risk of physical harm to Plaintiff. In particular, M/M Aluminum knew or had reason to know that the Alumina Refinery owners and operators were incompetent, as they lacked an adequate respiratory policy and failed to abide applicable government regulations.

104.     M/M Aluminum, Inc. should have expected that Plaintiff would be endangered by the use of supplied refinement machinery and equipment at the Alumina Refinery.

105.     M/M Aluminum, Inc. directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents  as a result of it supplying the refinement machinery and equipment, as well as the harm and damages Plaintiff sustained as a result of his exposure to bauxite dust.

### Count 5(c) – Heavy Equipment as Chattel

106.     At all relevant times, M/M Aluminum leased heavy machinery—chattels—to M/M Alumina for use at the Alumina Refinery. Workers at the Alumina Refinery used bulldozers, backhoes, cranes, dump trucks, and other large machinery to unload bauxite ore from vessels, position the raw bauxite ore in the storage shed, load raw bauxite ore onto conveyers, and to cleanup excess materials.

107.     The use of heavy equipment at the Alumina Refinery created and spread large amounts of bauxite dusts and its constituents. Consequently, the workforce at the Alumina Refinery is invariably exposed to and inhales bauxite ore dusts and its constituents.

108.     M/M Aluminum knew or had reason to know that the owners and operators of the Alumina Refinery were using supplied heavy equipment in a manner that involved an unreasonable risk of physical harm to Plaintiff. In particular, M/M Aluminum knew or had reason to know that the Alumina Refinery owners and operators were incompetent, as they lacked an adequate respiratory policy and failed to abide applicable government regulations. M/M Aluminum should have expected that Plaintiff would be endangered by the use of supplied heavy equipment at the Alumina Refinery.

109.     M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents as a result of it supplying the heavy

equipment as well as the harm and damages Plaintiff sustained as a result of his exposure to bauxite dusts and its constituents.

## Count 6 – Chattel Used to Supplier's Business Purpose

110.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin is liable to Plaintiff under Section 392 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands, as the successor-in-interest to M/M Aluminum.

111.     The Alumina Refinery served M/M Aluminum's business purpose. M/M Aluminum operated an international, vertically-integrated alumina production operation, which included mining raw ore, shipping raw ore, overseeing refinement, finding purchasers of refined alumina, and shipping raw alumina to purchasers.

### Count 6(a) – Bauxite as Chattel

112.     Prior to 1985, M/M Aluminum supplied bauxite ore—a chattel—to the Alumina Refinery for use. The bauxite ore was ultimately supplied to the employees at the Alumina Refinery, who refined the bauxite ore into alumina.

113.     M/M Aluminum should have expected that Plaintiff, other employees at the Alumina Refinery, and their respective families would be endangered by the probable use of the bauxite ore. It failed to exercise reasonable care to make the bauxite ore safe for the use for which it was supplied. It failed to exercise reasonable care to discover the dangerous condition or character of the bauxite ore it supplied. And it failed to inform Plaintiff or the other employees at the Alumina Refinery of the discover the dangerous condition or character of the bauxite ore it supplied.

114.     Consequently, M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff sustained as a result of this exposure.

## Count 6(b) – Refinery Appurtenances as Chattel

115.     At all relevant times, M/M Aluminum leased refining machinery, appurtenances, and equipment—chattels—to M/M Alumina for use at the Alumina Refinery.

116.     The Alumina Refinery is outfitted with machinery and equipment designed to move and pulverize bauxite ore. This machinery and equipment includes conveyor belts, chutes, ball grinders, digestors, etc. During refinement operations, these machines and equipment create and spread large amounts of bauxite ore dusts and its constituents. Consequently, the workforce at the Alumina Refinery was invariably exposed to and inhales bauxite ore dusts and its constituents.

117.     M/M Aluminum should have expected that Plaintiff, other employees at the Alumina Refinery, and their respective families would be endangered by the probable use of the refining machinery, appurtenances, and equipment. It failed to exercise reasonable care to make the refining machinery, appurtenances, and equipment for the use for which it was supplied. It failed to exercise reasonable care to discover the dangerous condition or character of the refining machinery, appurtenances, and equipment it supplied. And it failed to inform Plaintiff or the other employees at the Alumina Refinery of the discover the dangerous condition or character of the refining machinery, appurtenances, and equipment it supplied.

118.     Consequently, M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff sustained as a result of this exposure.

## Count 6(c) – Heavy Equipment as Chattel

119.     At all relevant times, M/M Aluminum leased heavy machinery—chattels—to M/M Alumina for use at the Alumina Refinery. Workers at the Alumina Refinery used bulldozers, backhoes, cranes, dump trucks, and other large machinery to unload bauxite ore from vessels, position the raw bauxite ore in the storage shed, load raw bauxite ore onto conveyers, and to cleanup excess materials.

120.     The use of heavy equipment at the Alumina Refinery created and spread large amounts

of bauxite dusts and its constituents. Consequently, the workforce at the Alumina Refinery is invariably exposed to and inhales bauxite ore dusts and its constituents.

121.    M/M Aluminum should have expected that Plaintiff, other employees at the Alumina Refinery, and their respective families would be endangered by the probable use of the heavy equipment. It failed to exercise reasonable care to make the heavy equipment safe for the use for which it was supplied. It failed to exercise reasonable care to discover the dangerous condition or character of the refining heavy equipment it supplied. And it failed to inform Plaintiff of the discover the dangerous condition or character of the heavy equipment it supplied.

122.    Consequently, M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff sustained as a result of this exposure.

### CAUSES OF ACTION AGAINST LOCKHEED MARTIN, AS SUCCESSOR-IN-INTEREST TO MARTIN MARIETTA ALUMINA, INC.

### Count 7 – Premises Liability

123.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

124.    Lockheed Martin Corp. is liable to Plaintiff as a premise in accordance with the rule articulated in *Machado v. Yacht Haven, U.S.V.I., LLC*, 61 V.I. 373 (2014), as the successor-in-interest to M/M Alumina.

125.    At all relevant times, M/M Alumina was a legal possessor of the Alumina Refinery.

126.    M/M Alumina had knowledge of the harmful nature of, and danger posed by, bauxite and alumina dusts and its constituents, caustic fumes and materials, and asbestos at all times while Plaintiff was on the Alumina Refinery premises. It knew that the potential for exposure at the Alumina Refinery posed a foreseeable and unreasonable risk of harm to Plaintiff and others.

127.    M/M Alumina had a duty to exercise reasonable care including providing Plaintiff with

a safe work environment and warning Plaintiff of any dangers that it could not make safe.

128. This foreseeable harm could have been prevented if M/M Alumina had implemented and enforced proper safety measures at the Alumina Refinery, and had also warned Plaintiff of the dangers.

129. M/M Alumina knew or should have known that Plaintiff would not discover or realize the danger, as M/M Alumina was in a superior position of power and knowledge.

130. M/M Alumina breached its duty by failing to use reasonable care to protect Plaintiff, by failing to warn Plaintiff of the dangers, and by failing to provide Plaintiff a safe work environment.

131. M/M Alumina's actions and failures to act include:

a. Failing to adequately monitor the concentration of bauxite and alumina dusts, caustic fumes and materials, and asbestos, as well as the dusts of its hazardous constituents and waste products, in the Alumina Refinery;

b. Failing to take appropriate safety precautions regarding to toxic, carcinogenic, hazardous, and/or irritating dusts, fumes, and other substances;

c. Failing to provide and require the wearing of protective clothing;

d. Failing to provide effective masks, respirators, and/or fresh air sources;

e. Failing to provide adequate changing rooms, showers, laundry, and other safety services for exposed workers;

f. Failing to post warning signs;

g. Failing to warn Plaintiff of the health risks associated with bauxite and alumina dusts, caustic fume and materials, and asbestos exposures, as well as exposure to as bauxite's hazardous constituents and waste products;

h. Failing to timely and appropriately train Plaintiff and his co-workers;

i. Failing to timely and appropriately engage in medical surveillance of exposed persons, including Plaintiff;

j.      Failing to timely and appropriately monitor workforce exposure and health, as well as family exposure and health, including that of Plaintiff.

132.    At all relevant times, the government of the Virgin Islands proscribed causing or permitting materials to be handled, used, constructed, altered, repaired, or demolished without taking appropriate precautions to prevent particulate matter from becoming airborne. In particular, the following precautions are required, among others:

a.      The use, where possible, of water or suitable chemicals for the control of dust in quarrying operations;

b.      The application of asphalt, water, or suitable chemicals on dirt roads or roads under construction, materials, stockpiles, and other surfaces that can give rise to airborne dust; and

c.      The installation and use of hoods, fans, and fabric filters to enclose and vent the handling of dusty materials.

133.    M/M Alumina's failures to abide by Virgin Islands law constitutes negligence *per se*. Family members of workers at the Alumina Refinery, like Plaintiff, fall within the ambit of these legal protections, as it is precisely those exposed to materials that leave the premise that would be most likely to be affected by the failure to abide.

134.    Consequently, M/M Alumina directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite, as well as the harm and damages Plaintiff sustained as a result of this exposure.

### CAUSES OF ACTION AGAINST GLENCORE LTD.

### Count 8 – Chattel Known to be Dangerous for Intended Use

135.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Glencore is liable to Plaintiff under Section 388 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

136. Glencore supplied bauxite ore—a chattel—to the Alumina Refinery for use from 1990 to 1995. It expect the Alumina Refinery and Plaintiff to use the bauxite ore, as well as expect that Plaintiff could be endangered by the probable uses of bauxite ore—namely, refinement.

137. Glencore knew or had reason to know that bauxite ore, bauxite dusts and its constituents is dangerous or likely to be dangerous during the refinement process. It had no reason to believe that the Alumina Refinery or Plaintiff would realize the dangerous condition of bauxite ore, bauxite dusts and its constituents. And it failed to exercise reasonable care to inform either the Alumina Refinery or Plaintiff of the dangerousness of bauxite ore, bauxite dusts and its constituents or the facts which make bauxite ore, bauxite dusts and its constituents likely to be dangerous.

138. Plaintiff was harmed by the bauxite ore supplied by Glencore to the Alumina Refinery.

139. Glencore directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff sustained as a result of this exposure.

## Count 9 – Chattel Unlikely to be Made Safe for Use

140. Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Glencore is liable to Plaintiff under Section 389 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

141. If Glencore provided warnings and MSDS sheets to the Alumina Refinery, those warnings and MSDS sheets went unheeded. Glencore knew or should have known that any warnings and sheets it may have provided were not being communicated to the workforce at the Alumina Refinery.

142. Glencore knew or should have known that the bauxite ore was unlikely to be made reasonably safe before being put to the use Glencore should expect it to be put—namely, refinement into aluminum powder.

143.     Plaintiff was a foreseeable user of the chattel, as well as endangered by the probable use of the chattel. He was ignorant as to the dangerous character of bauxite ore, its hazardous constitutents, and its waste products, and he was not contributorily negligent.

144.     Glencore directly and proximately caused, and is legally responsible and liable for, the harm and damages caused by Plaintiff's exposure to bauxite ore, its hazardous constituents, its waste products, and the refined alumina derived therefrom.

## Count 10 – Chattel for Use by Person Known to be Incompetent

145.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Glencore is liable to Plaintiff under Section 390 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

146.     Glencore knew or had reason to know that the owners and operators of the Alumina Refinery were using the bauxite ore supplied by Glencore in a manner that involved an unreasonable risk of physical harm to Plaintiff. It should have expected that Plaintiff would be endangered by the use of bauxite ore at the Alumina Refinery.

147.     In particular, Glencore knew or had reason to know that the Alumina Refinery owners and operators were incompetent. VIALCO had not previously owned or operated an alumina refinery prior to 1990 when it began operations in St. Croix. It failed to implement the necessary engineering controls to minimize worker exposure to bauxite, its constituent components, and waste products. It lacked an adequate respiratory policy to guard against the inhalation of bauxite dust, its constituent components, and waste products. It had a substandard safety department that was understaffed and/or not properly staffed by personnel with the necessary background and experience. It and its management failed to understand and/or was unconcerned with the dangers associated with bauxite dust and its constituents inhalation. It failed to implement and/or implemented substandard air monitoring or testing protocols to measure fugitive and/or bauxite dusts. And it failed to abide applicable OSHA

and/or MSHA regulations regarding handling and processing bauxite ore and/or its constituent components and waste products.

148.     Glencore directly and proximately caused, and is legally responsible and liable for, the harm and damages caused by Plaintiff's exposure to bauxite ore, its hazardous constituents, its waste products, and the refined alumina derived therefrom.

**Count 11 – Chattel Used to Supplier's Business Purpose**

149.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Glencore is liable to Plaintiff under Section 392 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

150.     The Alumina Refinery served Glencore's business purpose during the years of VIALCO's ownership and operation. At all relevant times, Glencore operated a multinational and vertically-integrated alumina refinement portfolio, consisting of mining, shipping, refinement, smelting, and marketing/selling.  Those bauxite ore served Glencore's business purposes because it was integral part of the start-to-finish operation.

151.     The bauxite ore as ultimately supplied to the Alumina Refinery, where it was crushed, ground, liquified, and disposed of. Glencore should have expected that Plaintiff and other employees at the Alumina Refinery would be endangered by the probable use of the bauxite ore and bauxite dusts, its hazardous constituents, its waste products, and the refined alumina derived therefrom.

152.     Glencore failed to exercise reasonable care to make the bauxite ore safe for the use for which it was supplied. It failed to exercise reasonable care to discover the dangerous condition or chacter of the bauxite ore.it supplied. And it failed to inform Plaintiff or the other employees at the Alumina Refinery of the discover the dangerous condition or character of the bauxite ore it supplied.

153.     Glencore directly and proximately caused, and is legally responsible and liable for, the harm and damages caused by Plaintiff's exposure to bauxite ore, its hazardous constituents, its waste products, and the refined alumina derived therefrom.

## Count 12 – Negligent Undertaking

154.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Glencore is liable to Plaintiff under Section 324A of the Restatement (Second) of Torts, which articulates a sound rule for the Virgin Islands.

155.     Glencore undertook to render services to its subsidiary VIALCO. It should have recognized the services it provided to VIALCO were necessary for the protection of Plaintiff, generally or in particular.

156.     Glencore failed to exercise reasonable care, which increased the risk of harm to Plaintiff. It undertook to perform a duty owed by VIALCO to Plaintiff.

157.     Plaintiff suffered harm because VIALCO relied on Glencore to fulfill its undertaking. And he suffered harm because he relied on Glencore to fulfill its undertaking.

158.     Glencore directly and proximately caused, and is legally responsible and liable for, the harm and damages caused by Plaintiff's exposure to bauxite ore, its hazardous constituents, its waste products, the refined alumina derived therefrom, caustic fumes, and asbestos.

### CAUSES OF ACTION AGAINST COSMOGONY II, INC. AS SUCCESSOR-IN-INTEREST TO GENERAL ENGINEERING CORP.

## Count 13 – Negligence

159.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. GEC is liable to Plaintiff as it acted negligently.

160.     GEC's services installing, removing, and replacing ACM, which work resulted in the release of asbestos fibers into the air.

161.     GEC was negligent insofar as it failed to take adequate precautions to guard against

and warn of the consequences these releases. Among other things, GEC failed to adequately train its employees on how to recognize and properly dispose of ACM. It failed to adequately warn its employees and those in the vicinity of the dangers of ACM or regarding the use of appropriate PPE.

162.     Further, GEC was negligent in its provision of maintenance work. It failed to adequately maintain the various mechanical components at the Alumina Refinery. In particular, the machinery used to convey and pulverize bauxite ore was constantly in poor working order, and as a result, fugitive bauxite emissions were frequent.

163.     Both instances of negligent presented foreseeable risks of harm—namely, that Plaintiff, his co-workers, and others would come into contact with and inhale an inordinate amount of ACM and bauxite dust.

164.     GEC owed a duty of reasonable care under the circumstances. In this specific case, its duty was to perform its construction and maintenance duties with the due care necessary for a refinery contractor, with the understanding that the materials at the Alumina Refinery were dangerous and required special precautions.

165.     However, GEC violated its duty of reasonable care as detailed above.

166.     GEC directly and proximately caused, and is legally responsible and liable for, the harm and damages caused by Plaintiff's exposure to bauxite ore, its hazardous constituents, its waste products, and asbestos.

## NOTICE OF PUNITIVE DAMAGES

167.     Plaintiff seeks punitive damages against Defendants.

168.     Defendants' respective failures as described herein were intentional and/or done or with a willful or reckless disregard of the rights of others, including the plaintiff.

169.     An award of punitive damages is warranted to punish the defendants, deter similar conduct by others, encourage others harmed to step forward, and to additionally compensate Plaintiff for the egregious conduct to which he was subjected.

## JURY TRIAL DEMANDED

170.     Plaintiff demands a trial by jury, pursuant to 5 V.I.C. § 358 and Rule 38(b) of the Virgin Islands Rules Civil Procedure, of all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests:

a.     After trial by jury, he be awarded full monetary damages afforded by law, including punitive damages;

b.     He be awarded pretrial interest from the date of the initial Complaint through final judgment;

c.     He be awarded his costs; and

d.     The Court grant such additional relief as may be deemed just and proper.

**DATED:**    August 7, 2022         Respectfully submitted,



Korey A. Nelson, Esq. (V.I. Bar No. 2012)
H. Rick Yelton, Esq. (V.I. Bar No. 2098)
BURNS CHAREST LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com
ryelton@burnscharest.com

Warren T. Burns, Esq. (V.I. Bar No. 2004)
Daniel H. Charest, Esq. (V.I. Bar No. 2020)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dcharest@burnscharest.com

J. Russell B. Pate, Esq. (V.I. Bar No. 1124)
THE PATE LAW FIRM
P.O. Box 370
Christiansted, USVI 00821
Telephone: (340) 777-7283
Facsimile: (888) 889-1132
pate@sunlawvi.com